# EXHIBIT D

```
 1
 2
 3
 4
 5
 6      IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA
 7                     IN AND FOR THE COUNTY OF WASHOE
 8                                  -oOo-
 9    BRETT GORDON MENMUIR, M.D.,           Case No. CV14-01473
10                    Plaintiff,            Department No. 7
11        vs.
12    SAFE SHOT, LLC, a federally
      licensed firearms dealer; et
13    al.,
14                    Defendants.
15    _____/
16
17                            DEPOSITION OF
18                            JAMES HARWIN
19                           April 21, 2015
20                            Reno, Nevada
21
22
23
24        REPORTED BY: CONSTANCE S. EISENBERG, CCR #142, RMR, CRR
25        JOB NO.: 241397
```

JAMES HARWIN - 04/21/2015

Page 78

1  and was not doing it.
2      But two of the people that were interested in buying it
3  said that after discussion with him, that's how he was coming
4  across to them, that he was -- to use probably the best term, is
5  he was trying to negotiate something behind our back.
6      We were still paying the rent, while he was doing this.
7  Q   Who was paying the rent?
8  A   Linda.
9  Q   How?
10 A   The bank account was still active for a month, and she
11 withdrew the funds from there to pay the rent until the funds were
12 exhausted.
13 Q   Okay.  So what ultimately happened with the business?
14 A   The business -- ultimately, there was a lease negotiated
15 with the landlord with Chris Parker.
16 Q   Okay.
17 A   The sale amount was reduced to, I think, $20,000.
18 Q   Okay.
19 A   Somewhere around there.  I think the initial they said
20 was 60- or 70,000, but I think the net amount was 10,000.
21     MR. BEKO:  Showing you what's marked as Exhibit Number 6
22 for identification.
23     (Exhibit 6 marked for identification.)
24 BY MR. BEKO:
25 Q   Do you recognize that document?

Page 79

1  A   Yes.
2  Q   Does that bear your signature on it?
3  A   No.
4  Q   Do you recognize your wife's signature?
5  A   It looks like hers.
6  Q   It's difficult for me to read what that sale price is,
7  but you think it was $20,000?
8  A   No.  As I mentioned, the net amount was around 20,000,
9  to my recollection, 15- to 20,000.
10     The gross amount, I think, was 65- or 70,000, but
11 proceeds out of escrow left a net of, I think, about 10,000 --
12 Q   What was --
13 A   -- to that --
14 Q   I'm sorry, I didn't mean to interrupt you.
15     What was deducted from the sale proceeds?
16 A   There was federal employee taxes due.  And there was --
17 actually, any of the taxing authority was due.  And there was a
18 promissory note to an ammunition company that had to be paid.
19 Q   So you are talking about employee taxes, withholdings
20 and things --
21 A   Correct.
22 Q   -- that hadn't been paid?
23 A   Well, that needed to be paid for those quarters, uh-huh.
24 Q   Were you in a deficit position on those?
25 A   They hadn't been paid yet.

Page 80

1  Q   But just for the current quarter?
2  A   For the current quarter and one quarter prior, to my
3  knowledge.
4      I don't remember.  All I know, there was an amount due
5  to the IRS that had to be paid from the proceeds of the sale and a
6  promissory note to an ammunition company.
7  Q   And who was the ammunition company?
8  A   International Cartridge Corporation.
9  Q   Do you see that somewhere in this document?
10 A   Yes.
11 Q   Oh, you are on the final page of it?
12 A   Yes, sir.
13 Q   According to that, it says that the balance of that lien
14 is $65,000?
15 A   It looks like it says 55-.
16 Q   Okay.  It could be.  I can't tell.
17 A   Yeah, it's pretty muddy in there, but my reading glasses
18 help a bit.  It looks like 55- to me.
19 Q   Okay.  What other debts did Safe Shot have at the time
20 that it closed?
21 A   There were no other debts, to my recollection.
22 Q   Was Safe Shot financially stressed in 2014?
23     MR. MALSCH:  At what point in 2014?
24     MR. BEKO:  Well, obviously, before the doors closed.
25 ///

Page 81

1  BY MR. BEKO:
2  Q   Before your arrest, was Safe Shot stressed?
3  A   No.
4  Q   You obviously -- strike that.
5      You were indicted on six separate counts of violations
6  of federal firearms laws, were you not?
7  A   That was the initial indictment.
8  Q   And ultimately, you pled guilty to one of those charges;
9  is that correct?
10 A   Correct.
11 Q   And we're going to go through those in a while.
12     Tell me -- you obviously violated these federal laws
13 relating to the sale of certain types of weapons, correct?
14     MR. MALSCH:  Objection.
15     THE WITNESS:  No, I did not.
16 BY MR. BEKO:
17 Q   You didn't?
18 A   No, I didn't.
19 Q   Do you recall signing a plea agreement?
20 A   Yes, I do.
21     MR. BEKO:  I'm going to show you what's marked as
22 Exhibit Number 7 for identification.
23     (Exhibit 7 marked for identification.)
24 BY MR. BEKO:
25 Q   Do you recognize that document?  This one, I do have a

JAMES HARWIN - 04/21/2015

Page 82

```
 1  copy of.
 2     A    Yes, I do.
 3     Q    "Yes"?
 4     A    Yes, I do.
 5     Q    All right.  Does that bear your signature on that
 6  document?
 7     A    Yes, it does.
 8     Q    Okay.  And that -- if you'll turn to page 2 under
 9  paragraph Roman numeral II-A, do you see there where you are
10  signing this that you are knowingly and voluntarily agreeing to
11  plead guilty to the following charge?
12     A    Correct.
13     Q    All right.  Then would you turn to page 4.
14          Do you see that first paragraph there, D?
15     A    Yes.
16     Q    It says "The defendant admits and declares under penalty
17  of perjury that the facts set forth below are true and correct."
18          Do you see that?
19     A    Yes.
20     Q    And were those facts true and correct under penalty of
21  perjury?
22     A    I'm not going to answer that.
23     Q    Why not?
24     A    I don't want to.
25          MR. MALSCH:  I think the document speaks for itself.  He
```

Page 83

```
 1  says he signed it -- he signed it under penalty of perjury, and
 2  beyond that --
 3          THE WITNESS:  Move on.
 4          MR. BEKO:  Sir, you cannot, in a deposition, tell me to
 5  move on.
 6          MR. MALSCH:  Just hold on a second.
 7          I think what Mr. Harwin is trying to say is he's
 8  invoking his Fifth Amendment right not to incriminate himself
 9  because the case is still pending, sentencing is pending.
10          THE WITNESS:  That's correct.
11  BY MR. BEKO:
12     Q    Are you asserting your Fifth Amendment right?
13     A    I'm asserting my Fifth Amendment right, yes, sir.
14     Q    To a charge you've already pled guilty to?
15     A    I'm asserting my Fifth Amendment right, right now.
16          MR. BEKO:  Well, I have the right under Rules of Civil
17  Procedure to suspend this deposition to seek a ruling on this.
18  I'm going to do that.
19          But what I would like to do is to continue with some of
20  these additional questions that I have, because it's going to
21  prompt me to additional discovery, and I need to get that
22  information because it was not provided in the discovery
23  responses.
24          MR. MALSCH:  I have no problem moving forward with the
25  deposition with respect to other areas of inquiry unrelated to the
```

Page 84

```
 1  criminal case.
 2          If you want to ask additional questions related to the
 3  criminal case, we'll take them on a question-by-question basis as
 4  to whether he asserts his Fifth Amendment right or not.
 5          You can do it either way.  You can do it as a general
 6  and we can go to the court and see how they feel about it, on the
 7  specific -- on that specific issue.
 8          However way you want to proceed is acceptable.
 9          MR. BEKO:  I want to go forward because the discovery
10  needs to move forward.
11          MR. OSBORNE:  When is the sentencing?
12          MR. MALSCH:  Right now, it's scheduled for the beginning
13  of May.
14          Correct?
15          THE WITNESS:  Correct.
16          MR. MALSCH:  Let me take two seconds.
17          MR. BEKO:  Okay.
18              (A recess was taken.)
19          MR. BEKO:  Okay.  We're back on the record?
20          MR. MALSCH:  Yeah.
21  BY MR. BEKO:
22     Q    Mr. Harwin, you acknowledged that you signed this
23  document where you admit under penalty of perjury that you engaged
24  in all the conduct that is alleged and described in this document.
25          I'm curious as to why it is, what motivated you to do
```

Page 85

```
 1  the things you did that caused you to get charged and ultimately
 2  convicted of these crimes.
 3     A    Again, I respectfully invoke my Fifth Amendment right
 4  against self-incrimination.
 5     Q    Okay.  Let's go back.
 6          MR. MALSCH:  Let's go off the record one second.
 7              (A discussion was held off the record.)
 8          MR. BEKO:  We're back on the record.
 9          Just so our record is clear, counsel indicated that
10  depending upon, I guess, the further proceedings in this case, the
11  position may change as far as the Fifth Amendment is concerned.
12          And I think, quite frankly, my position is that having
13  pled guilty to these charges, there's no Fifth Amendment right any
14  longer, and I will seek a ruling to that effect.
15          And maybe, you know, by the time that ruling comes down,
16  the sentencing will have been imposed and your position may very
17  well change.
18          Is that fair?
19          MR. MALSCH:  I think that's accurate.  It's our position
20  that his Fifth Amendment right continues, at least through
21  sentencing.  And if there's an appeal for any reason -- which I'm
22  not involved in that case, so I don't know the legal aspects of
23  those issues.
24          Obviously, an appeal can also have an effect on that.
25  But if there's no appeal and the sentencing is what the sentencing
```